**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**KELLEIGH BROUSSARD**                                                                         **PLAINTIFF**

**VS.**                                                                         **CIVIL ACTION NO.:** 1:26cv110 HSO-BWR

**PEARL RIVER COUNTY SCHOOL DISTRICT**                                         **DEFENDANT**

**COMPLAINT
JURY TRIAL DEMANDED**

**COMES NOW** the Plaintiff, Kelleigh Broussard, by and through her counsel, The Watson Law Firm, PLLC, and files this action against Defendant, Pearl River County School District, for violation of the Establishment Clause of the First Amendment to the United States Constitution, as incorporated against the states through the Fourteenth Amendment, enforced through 42 U.S.C. §1983, Title VII of the Civil Rights Act of 1964 for religious and sex discrimination, violation of her rights under the 14th Amendment through 42 U.S.C. §1983 for sex discrimination.  In support of this cause, the Plaintiff would show unto the Court the following facts to-wit:

**PARTIES**

1.      The Plaintiff, Kelleigh Broussard, is an adult female resident citizen of Harrison County, Mississippi.

2.      Defendant, Pearl River County School District, may be served with process by serving Jeremy Weir, Superintendent, 130 Alphabet Avenue Carriere, Mississippi 39426.

**JURISDICTION AND VENUE**

3.      This action arises under the Establishment Clause of the First Amendment to the United States Constitution, as incorporated against the states through the

1

Fourteenth Amendment and enforced through 42 U.S.C. §1983; and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq.

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343(a)(3) and (4) and 42 U.S.C. § 2000e-5(f)(3).

5.      Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because Defendant resides in this district and a substantial part of the events or omissions giving rise to the claims occurred in Pearl River County, Mississippi, which is located within the Southern District of Mississippi.

6.      Plaintiff filed a Charge of Discrimination with the EEOC on May 29, 2025, a true and correct copy of which is attached as Exhibit "A."  The EEOC issued a Notice of Right to Sue on January 13, 2026, a true and correct copy of which is attached as Exhibit "B."  Plaintiff timely files this action within ninety (90) days of receipt of her Notice of Right to Sue. Plaintiff's claims under 42 U.S.C. §1983 do not require administrative exhaustion.

## STATEMENT OF THE FACTS

7.      Plaintiff is a female resident of Harrison County and Biloxi, Mississippi.

8.      Plaintiff is 54 years old.

9.      Plaintiff was raised Roman Catholic. Plaintiff was adopted, and approximately fifteen (15) years ago discovered that her biological father was of Jewish heritage. DNA testing subsequently confirmed that Plaintiff is of fifty percent (50%) Jewish ancestry. Since learning of her biological and religious heritage, Plaintiff has spent approximately the past decade privately exploring Judaism as a meaningful and sincere component of her personal religious identity.

2

10.     During March 2025, Plaintiff applied for the position of Superintendent of the Pearl River County School District (PRCSD).

11.     Due to the deeply personal nature of this discovery and Plaintiff's awareness of the pervasive prevalence of anti-Semitism, Plaintiff has guarded this information closely and has disclosed it to only a small number of trusted individuals, including her spouse, her children, other family members, a trusted colleague, and Rabbi Barbara Aiello, with whom Plaintiff corresponded during her religious exploration. Plaintiff does not actively practice any Christian denomination.

12.     Plaintiff has 23 years of experience in public education, including almost four years as Assistant Superintendent in one of Mississippi's highest-performing districts.

13.     During Plaintiff's tenure in her current role as Assistant Superintendent, the district achieved a statewide academic ranking of #1, subsequently ranked #2, then #3, and later returned to a #1 ranking, reflecting sustained academic excellence over multiple years.

14.     Plaintiff's leadership has resulted in numerous accolades and awards with recognition at the local, state, and national level.

15.     Her qualifications aligned strongly with both the job description for the position of Superintendent and the community stakeholder feedback report compiled by PRCSD.

16.     Plaintiff met or exceeded all preferred qualifications listed in the report compiled by the PRCSD.

17.     In early 2025, PRCSD announced a vacancy for the position of

Superintendent and published a job description identifying preferred qualifications, including district-level administrative experience and a doctoral degree or equivalent advanced preparation.

18.     Plaintiff applied for the Superintendent position and was selected to advance to the interview stage.

19.     As part of the superintendent search, PRCSD conducted stakeholder surveys and meetings to solicit community and employee input regarding priorities for the next Superintendent.

20.     PRCSD published a Stakeholder Expectations Report summarizing feedback from approximately one hundred seventy-eight (178) respondents.

21.     The Stakeholder Expectations Report identified academic excellence as a non-negotiable foundation and emphasized leadership experience, fairness, transparency, accountability, and integrity.

22.     The Report reflected stakeholder concerns regarding favoritism and nepotism and expressed a desire for leadership with demonstrated district-level experience and impartiality.

23.     Prior to superintendent interviews, PRCSD conducted multiple stakeholder meetings at the District Office Conference Room during regular daytime hours, demonstrating the availability of neutral and private facilities suitable for sensitive discussions.

24.     In the Stakeholder Survey Feedback Report from PRCSD, stakeholders provided their feedback as recommendations for the hiring process for the position of Superintendent.

25.    The stakeholders expressed concern about the potential for favoritism and nepotism.

26.    They requested a superintendent who could promote fairness, accountability, and merit-based advancement.

27.    Stakeholders specified that desired leadership characteristics reflect a candidate with demonstrated success as an instructional leader, preferably with central office and district-level experience.

28.    Multiple respondents emphasized the importance of understanding curriculum, an area in which Plaintiff holds a specialist's degree.

29.    Stakeholders also emphasized the need for a superintendent who is an independent thinker and who is not influenced by local politics, personal alliances, or internal pressure.

30.    Strong preference was expressed for external candidates without close ties to the district.

31.    Stakeholders emphasized the need for a fresh perspective unburdened by existing relationships or district history.

32.    Plaintiff contends that the stakeholder feedback was disregarded and ignored by the PRCSD.

33.    On April 28, 2025, PRCSD conducted superintendent interviews during a Special Called Meeting of the Board of Education.

34.    Official Board minutes reflect that the meeting was held at the PRC Endeavor Campus Chapel.

35.    The Endeavor Campus Chapel contained religious imagery at the time of

the interviews and was not the Board's customary meeting location.

36.    Prior to her interview, Plaintiff asked the Board Secretary whether the Endeavor Campus Chapel was the Board's normal meeting location. The Board Secretary confirmed to Plaintiff that the chapel was not PRCSD's usual meeting site. Per the Board Secretary, the Board typically held its regular meetings in the Pearl River County Middle School library. During the superintendent search process, PRCSD used the District Office Conference Room for confidential and sensitive daytime meetings, and the Pearl River High School Performing Arts Center for community stakeholder meetings. Notably, the March 25, 2025 community stakeholder meeting was scheduled to be held at the District Office but was instead held at the Pearl River High School Performing Arts Center, and the only community members present at that meeting were Mr. Jeremy Weir and his wife.

37.    The PRC Endeavor Campus Chapel is a structure with a cross visibly displayed on the exterior of the building. The interior of the chapel contained prominent and unavoidable religious imagery, including framed colored images depicting Jesus Christ carrying the cross displayed around the perimeter of the room in a manner consistent with the Catholic devotional practice of the Stations of the Cross. These images were clearly visible from the location where Plaintiff was seated throughout the interview proceedings.

38.    The furnishings within the chapel had been rearranged for the interview proceedings. Church pews or similar furnishings had been moved to the sides of the room. A small table was placed in the center of the room where Plaintiff was directed to sit, positioned directly facing the tables and chairs arranged for and occupied by the five

(5) Board members. No other candidates, staff members, or observers were present during Plaintiff's interview.

39.     At no time prior to Plaintiff's arrival at the chapel was Plaintiff informed that the interview proceedings would include a prayer, an invocation, or any reading from a Biblical or religious text.

40.     At no time prior to or during the interview proceedings did any Board member, the Board Secretary, or any other representative of PRCSD provide Plaintiff with any instruction regarding how she was expected to conduct herself during the opening of the meeting.

41.     On April 28, 2025, Plaintiff was interviewed by the PRCSD Board in a chapel, which was not the Board's normal meeting site.

42.     The interview proceedings opened with an invocation, during which a board member read from the Bible or a Biblical text.

43.     Following the invocation, the Pledge of Allegiance was recited.

44.     The official Executive Session minutes of PRCSD reflect that the April 28, 2025, Special Called Meeting of the Board of Education opened with an invocation prior to the Board entering executive session to conduct superintendent interviews.

45.     During the opening of the interview proceedings, Board Member Donnie Saucier read aloud from a religious text, which was Biblical in nature, as part of the Board's official proceedings.

46.     This went well beyond a customary bowing of the head at the beginning of a meeting with generic words of praise given.

47.     The invocation and religious reading occurred immediately before the

Board began evaluating candidates for the Superintendent position and took place with Plaintiff while she was alone with the all-male Board of Education.

48.    The superintendent selection process departed from neutral norms by holding interviews in a religious chapel rather than a neutral venue despite the availability of customary conference facilities.

49.    The process further departed from neutrality by opening the interview proceedings with prayer and the reading of a Biblical religious text by a Board member which coerced Plaintiff's participation.

50.    Plaintiff was seated alone at a small table directly facing all five (5) male Board members, who are the sole individuals vested with governmental authority to select the next Superintendent of PRCSD. The power imbalance was pronounced and absolute: Plaintiff was a candidate seeking a position of public employment, and the Board members were the exclusive governmental decision-makers over her candidacy. No other persons were present.

51.    When the Biblical reading began, Plaintiff felt caught off guard and disoriented. She was acutely aware that all five Board members were seated directly facing her and were observing her conduct as a candidate under active evaluation. Plaintiff did not know how she was expected to conduct herself, but understood that she had no meaningful option other than to conduct herself in a manner that would not negatively affect her candidacy.

52.    Plaintiff briefly considered not bowing her head. However, upon observing all five Board members bow their heads while remaining positioned directly facing her, Plaintiff reasonably believed that any failure to participate in the religious exercise would

8

draw adverse attention to her, would appear disrespectful or uncooperative to the individuals evaluating her candidacy, and would negatively affect her prospects for the Superintendent position.

53.     There was no meaningful opportunity for Plaintiff to decline participation or to leave the room. Plaintiff was alone in the chapel with five male Board members who were the sole governmental decision-makers over her employment candidacy. Departing from the room or visibly declining to participate would have been immediately apparent to all five Board members, would have disrupted the official governmental proceedings, and would have caused Plaintiff to effectively forfeit her candidacy.

54.     During the reading, Plaintiff bowed her head out of deference to those present who might be practicing Christians.

55.     Internally, Plaintiff felt it strange and frankly inappropriate for there to be a reading from the Bible as a prelude to a meeting held for the purpose of filling a vacancy in a public school district.

56.     During the reading, Plaintiff experienced a severe physical stress response, including intense heat, sweating, and acute anxiety. She attempted to observe the Board members by glancing upward in order to understand what was expected of her and to avoid any conduct that might be perceived negatively by her evaluators. Plaintiff experienced a partial dissociative response due to anxiety overload. When the reading concluded, Plaintiff exhaled and attempted to compose herself, though she continued to tremble internally. She remained concerned that her visible reaction during the religious exercise may have already negatively affected her candidacy.

9

57.    Plaintiff, who is of fifty percent (50%) Jewish ancestry and has been privately and sincerely exploring Judaism as her personal religious identity for approximately a decade, felt like an outsider placed into a Christian religious exercise with no guidance and in a setting profoundly foreign and distressing to her religious identity. She felt uncertain, self-conscious, fearful, overwhelmed, flustered, and panicked throughout the exercise. The experience was compounded by the awareness that all five Board members were simultaneously the officiants of the religious exercise and her sole governmental evaluators.

58.    The setting, timing, and power dynamics of the situation placed Plaintiff in an inherently coercive environment in which she was effectively compelled to participate in a religious exercise as a direct condition of her participation in an official governmental hiring process for a position of public employment.

59.    After the invocation, the Pledge of Allegiance was conducted.

60.    Then the interview began, and the board members asked Plaintiff various questions.

61.    None of the questions related to Plaintiff's practice of religion and none of her responses addressed the matter of her religious practice or lack thereof.

62.    During the interview, Board President Eli Ouder paused, looked directly at Plaintiff, and stated that if selected, Plaintiff would be "the face of the district." This statement was not contained in the Board's official list of recommended interview questions. At the conclusion of the interview, Board Member Frazier approached Plaintiff and stated: "If you prepare for everything like you did for this interview, I know you'll do an amazing job."

63.     On the evening of April 28, 2025, Plaintiff learned that she had not been selected for the position and instead was informed that the Board was going to move forward with another candidate.

64.     Thereafter, the PRCSD publicly announced its candidate of choice was Mr. Robin "Jeremy" Weir.

65.     Mr. Weir has a bachelor's degree and a master's degree, but he has no district-level leadership experience.

66.     From the standpoint of experience, therefore, Mr. Weir has substantially less experience and qualifications than Plaintiff has.

67.     Following the interviews, the Board voted in executive session on April 28, 2025, to offer the Superintendent position to Jeremy Weir.

68.     Mr. Weir did not possess district-level central-office experience and did not hold a doctoral degree or advanced specialist degree that were stated as preferred qualifications.

69.     Mr. Weir exited public education in 2022 and had not served in a district-level administrative role during the intervening period.

70.     Mr. Weir allowed his Mississippi educator license to lapse and did not hold an active administrator license for a period prior to the superintendent search.

71.     Mississippi Department of Education licensure records reflect that Mr. Weir's administrator license was issued on February 20, 2025, shortly before the superintendent interview process.

72.     Plaintiff contends that during or around the 2021/2022 school year, Mr. Weir was terminated from his educator job with the Bay St. Louis-Waveland School

11

District and escorted off the property

73.  Plaintiff further contends that Mr. Weir obtained his Mississippi Educator License only five days before the PRCSD Superintendent position was posted.

74.  Mr. Weir resigned due to being allowed to choose this option as his exit from public education where he was removed from campus as a building principal for the Bay-Waveland School District.

75.  Numerous newspaper articles and radio publications documented his removal.

76.  He allowed his license to lapse and had been out of public education as a licensed, practicing administrator until just before the announcement of this job.

77.  So, while he had previously completed the Prospective Superintendent's Leadership Academy, he subsequently resigned as his career had reached an unfavorable outcome.

78.  Mr. Weir did not possess district-level central office administrative experience, meaning executive responsibility for the day-to-day management of district operations, including curriculum, instruction, personnel, finance, accountability, or compliance.

79.  Although PRCSD cited Mr. Weir's prior service as a school board member in its Position Statement, that role involved governance and oversight rather than executive or operational administration within a district's central office.

80.  Serving on a school board does not require an educator license in Mississippi, meaning that a community member outside of education can serve in that capacity.

81.     Although PRCSD is attempting to use this as evidence of Mr. Weir having district level experience, Plaintiff contends it is not true evidence of that at all.

82.     By contrast, Plaintiff possessed substantial district-level central office experience, served in a senior executive leadership role overseeing core instructional and administrative functions, and met or exceeded the preferred qualifications set forth in PRCSD's Superintendent job announcement while maintaining uninterrupted educator licensure in Mississippi enabling her to serve in an administrative capacity.

83.     Plaintiff was not selected for the Superintendent position despite her superior qualifications and experience, and PRCSD instead selected a male candidate with significantly less relevant administrative experience.

84.     It is also notable that Mr. Weir is a lifelong friend of the PRCSD School Board President, Eli Ouder.

85.     In its Position Statement, PRCSD denies that favoritism or personal relationships influenced the superintendent selection and claims that the process was impartial.

86.     PRCSD further denies any longstanding personal relationship between the Board President and Mr. Weir.

87.     Yet, on May 4, 2025, after the superintendent selection was made, Board President Eli Ouder publicly stated that he had known Mr. Weir "most of my life" and described a longstanding personal relationship dating back to their youth.

88.     Mr. Ouder made these statements publicly in connection with social media posts announcing and celebrating Mr. Weir's appointment as Superintendent.

89.     Prior to his selection, Mr. Weir publicly stated that he applied for the

13

Superintendent position "after much prayer and wise counsel."

90. During the period preceding the superintendent selection, Mr. Weir conducted regular Fellowship of Christian Athletes (FCA) meetings on PRCSD campuses, resulting in his weekly presence on school property to meet with students.

91. Board President Eli Ouder's son participated in FCA programming during this period.

92. In addition to FCA involvement, both Mr. Ouder and Mr. Weir publicly participated as featured guests on a faith-based podcast ministry affiliated with First Baptist Church Picayune, discussing their faith and religious experiences on separate occasions in support of the church's men's ministry.

93. Additionally, Mr. Weir and Mr. Ouder demonstrated ongoing correspondence around the time of the hiring process with public exchanges made between them on social media.

94. Their frequent, ongoing exchanges often used emojis such as a male muscular bicep to show their ongoing support of one another along with liking and/or loving each other's comments.

95. On April 29, 2025, the day following the Board's decision to hire Mr. Weir, Board President Eli Ouder publicly shared PRCSD's official announcement of Mr. Weir's selection as Superintendent on his personal social media page and captioned the post "God's Plan."

96. I In connection with public posts announcing and promoting the Superintendent Meet-and-Greet event for Mr. Weir, Board President Eli Ouder publicly praised Mr. Weir and encouraged the community to attend the event.

97.    As part of ongoing, frequent posts made in proximity to the time of hire, Board President Eli Ouder publicly praised Mr. Weir as a "faithful servant of the Lord" and credited him with having a significant spiritual and personal impact on the lives of his sons through religious activities, including Fellowship of Christian Athletes programming, which Mr. Weir led on the campus of Pearl River High School on a weekly basis.

98.    After Mr. Weir was hired as Superintendent, Mr. Ouder's son received an FCA award, which Mr. Ouder publicly acknowledged and attributed to Mr. Weir's influence. In return, Mr. Weir publicly thanked Mr. Ouder for his support.

99.    On May 29, 2025, Plaintiff filed an EEOC Charge of sex and religious discrimination against PRCSD.

100.   On July 11, 2025, in response to Plaintiff's Charge, PRCSD submitted a Position Statement to the EEOC.

101.   PRCSD's Position Statement alleges that, "...Upon the notification of the pending retirement of its previous superintendent in mid-February 2025, the School Board adopted a process and projected timeline for filling the superintendent's position at its February 21, 2025 meeting. (See Exhibit 2, February 21, 2025 Board meeting minutes. The timeline included an application period, sending a survey to community members, staff, and parents, town hall meetings, meetings with school administration and staff, releasing a report regarding the survey and town hall meetings, selecting applicants to interview, conducting interviews, and selecting the successful candidate. (Exhibit 3, February 21, 2025 Board meeting minutes)."

102.   Plaintiff contends this allegation is significantly lacking in relevant detail.

103.    PRCSD's Position Statement further alleges that, "On February 21, 2025, the School Board prepared an announcement advertising the superintendent vacancy and outlining basic qualifications for the position. (Exhibit 3, Superintendent Search News Release – February 25, 2025) The application deadline was March 25, 2025. (Exhibit 3, Superintendent Search News Release – February 25, 2025) The School Board took several steps to collect feedback from the community and from employees of the District. (Exhibit 3, Superintendent Search News Release – February 25, 2025) The School Board held Town Halls on March 11, 2025 (Exhibit 4, March 11, 2025 10:00 am Board meeting minutes re Town Hall) and March 25, 2025. (Exhibit 5, Agenda and minutes for Special called meeting for March 25, 2025 at 6:00pm) The School Board provided meeting opportunities at 11:00 am, 1:00 pm, and 3:00 pm on March 25, 2025 for every employee stakeholder to provide feedback regarding the qualities important in the next superintendent. (Exhibit 6, Agenda and minutes for Special called meeting on March 25, 2025 at 11:00am, 1:00pm, and 3:00pm) Surveys were made available on social media and on the school website for all stakeholders to provide input. (Exhibit 7, Copy of survey questions) The survey submission deadline was March 25, 2025. (Exhibit 3, Superintendent Search News Release – February 25, 2025) The School Board prepared a compilation of the responses for community review. (Exhibit 8, Stakeholder Expectations for the Next Superintendent) The School Board conducted candidate interviews on April 28, 2025. (Exhibit 9, April 28, 2025 Board meeting minutes) The School Board followed a preprepared interview format with each candidate. (Exhibit 10, PRCSD Superintendent Interview Guidelines and Recommended Questions) At the conclusion of the interviews, the School Board

16

selected Mr. Jeremy Weir as the next superintendent. (Exhibit 11, April 28, 2025 Executive Session minutes.)"

104. Plaintiff contends this allegation mischaracterizes the events that occurred and omits essential context.

105. Although PRCSD alleges to have conducted a non-discriminatory hiring process by including items such as a prepared interview format and recommended questions, this did not transpire during the actual interview.

106. The questions presented via round robin questioning did not stick to that format.

107. For example, Board Member Herring asked, "Are you the type that lets the tail wag the dog?"

108. They did not adhere to their questions presented as evidence of how they conducted the interview.

109. PRCSD's stated rationale for the selection decision was inconsistent with stakeholder feedback, state accountability data, and its own denials regarding personal relationships later contradicted by public statements of the Board President.

110. So, despite gathering stakeholder feedback, PRCSD ignored the findings.

111. PRCSD's Position Statement alleges that, "The District hired Mr. Weir as superintendent based on legitimate, non-discriminatory reasons. (Mississippi law provides that the School Board only speaks through its minutes.) When Mr. Weir interviewed for the superintendent position at PRCSD, he knew that the District was looking for a leader to improve the climate and culture in the District. He learned this information first hand from attending both of the School Board's town hall meetings that

17

were open to the public. At those meetings, both the board members and the public expressed that climate and culture were a major concern in the district. The district is doing very well academically, but the climate and culture needed improvement. In his interview, he focused heavily on climate and culture and what he would do to improve PRCSD's climate and culture. His specialty as a principal was in improving climate and culture. His position in his interview was that academic growth and success are only sustainable when the culture and climate are good for teachers and students. Although he focused heavily on the climate and culture aspects, he also was very clear that he could lead the district in continuing the academic excellence that had been established. Having been the principal of a school that progressed from being rated C to being rated as an A, he fully understood the leadership that it takes to grow academically and maintain that growth. In preparation for seeking a position as a superintendent, he completed the Mississippi School Board Association Prospective Superintendents Academy. He also submitted to the School Board a portfolio and plan specific to his vision for PRCSD. (Exhibit 12, Jeremy Weir Professional Portfolio: Making PRCSD a Great Place to Teach and A Great Place to Learn)."

112.   Plaintiff contends this allegation contains information that is false and misleading.

113.   PRCSD alleges that the superintendent selection process was fair and nondiscriminatory.

114.   PRCSD further alleges that Mr. Weir emphasized culture and climate during his interview and that these factors were particularly important because, according to the district, PRCSD was already in strong academic condition.

115. PRCSD relied on this characterization to distinguish Mr. Weir from Plaintiff despite the Stakeholder Expectations Report identifying academic excellence as a non-negotiable priority.

116. At the time PRCSD made this representation, publicly available Mississippi Department of Education accountability data reflected that at least one PRCSD school was designated for Additional Targeted Support and Improvement (ATSI).

117. Moreover, internal communications later reflected that PRCSD personnel sought instructional support from Plaintiff's district, including arranging classroom observations due to academic performance concerns at PRC Middle School.

118. The PRC middle school was designated as ATSI because subgroup performance fell within the bottom 5% for academic performance in the State of Mississippi.

119. When this degree of very poor academic performance is present, ATSI schools are required by the Mississippi Department of Education to implement an improvement plan, and their compliance with the plan is monitored by the state.

120. PRCSD's allegation that it had "established academic excellence" is therefore clearly false.

121. The community stakeholder feedback report indicated that teacher retention was of great concern.

122. While Mr. Weir presented a portfolio focusing on culture and climate, Plaintiff submitted an action plan with measurable goals aligned to the district's strategic plan, Mississippi Department of Education report cards, Special Education

19

Determination Report, and stated stakeholder priorities that also covered culture and climate with her submission grounded in her doctoral research (Teacher Job Satisfaction as a Retention Strategy), thereby demonstrating her expertise in the field again exceeding that of Mr. Weir's.

123. At the Mississippi School Board Association Conference held in February 2026, Plaintiff co-presented with a fellow superintendent on the topic of Sustaining Excellence premised on culture, leadership, and retention.

124. The session was attended by Jeremy Weir.

125. PRCSD's Position Statement alleges that, "Personally, Mr. Weir was vested in the PRCSD community. After his retirement from education 2022, he volunteered at PRCSD with school sports programs. He possessed in-depth knowledge of the community as he was a resident of the community, but could bring experience and knowledge gained in other districts back to PRCSD. Further, while his many years of administrative experience were at the building level, rather than at the district level, he knew and understood the ultimate policy challenges and responsibilities of a school district because he had served for eight years, beginning in 2011, on the PRCSD School Board. Four of those eight years, he worked very closely with the PRCSD superintendent at the District level during his role as President of the School Board. Mr. Weir was selected as the superintendent from a qualified pool of applicants interviewing for the position. As indicated above, his selection as superintendent was a legitimate and non-discriminatory decision by the School Board."

126. Plaintiff contends this allegation mischaracterizes relevant events that occurred and omits essential context.

127. As a direct and proximate result of PRCSD's discriminatory and unconstitutional conduct, Plaintiff has suffered and continues to suffer significant economic and non-economic damages. The PRCSD Superintendent position carries a starting annual salary of $130,000, with annual increases, performance-based bonuses, and vehicle and telephone stipends standard to superintendency positions in Mississippi. Plaintiff's current annual salary is $111,135.81. As a result of PRCSD's failure to hire her, Plaintiff has suffered loss of wages and employment benefits, including substantial long-term loss of retirement and pension benefits calculated under the Public Employees' Retirement System of Mississippi ("PERS") based on the highest four years of salary. Because Plaintiff's retirement pension will be calculated on the basis of her current salary rather than the Superintendent salary she would have received, the cumulative loss to Plaintiff's retirement income over the course of her lifetime will be substantial.

128. As a result of PRCSD's conduct, Plaintiff experienced significantly increased anxiety, sleep disruption, persistent rumination, acute humiliation, and physical health consequences including elevated blood pressure. Plaintiff sought medical care following the events described herein. Plaintiff's treating physician doubled her anxiety medication as a direct result of these events. Plaintiff independently consulted a cardiologist due to cardiovascular concerns arising from these events, given her family history of cardiac disease (her mother died of a heart attack at age fifty-seven (57)) and underwent cardiac testing including electrocardiograms and a cardiac stress test. Plaintiff continues to actively manage elevated blood pressure and has required ongoing medication adjustments as a direct consequence of the events described

herein.

129.   The experience has caused Plaintiff significant professional harm in addition to economic and physical harm. As a direct consequence of the distress, humiliation, and anxiety caused by PRCSD's conduct, Plaintiff has declined to apply for other superintendent or comparable leadership positions. Plaintiff's professional reputation, sense of professional identity, and willingness to pursue career advancement have been materially and adversely affected.

130.   Plaintiff contends she was discriminated against due to religion and sex.

131.   Plaintiff further contends that the minutes of the meetings illustrate that the superintendent selection process was marked by religious endorsements, deviation from neutral procedures and from the attributes requested in the community stakeholder feedback report, abandonment of stated required qualifications, and inconsistent explanations.

132.   These actions constituted discrimination against Plaintiff due to religion and sex.

## CAUSE OF ACTION

### COUNT I: VIOLATION OF THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION – 42 U.S.C. §1983

133.   Plaintiff re-alleges and incorporates all averments set forth in paragraphs 1 through 132 above as if fully incorporated herein.

134.   The Establishment Clause of the First Amendment to the United States Constitution, as incorporated against the states through the Fourteenth Amendment, prohibits governmental entities from endorsing religion and from coercing individuals to participate in or support religious activity.

135. PRCSD is a governmental entity and state actor subject to the First and Fourteenth Amendments to the United States Constitution.

136. The PRCSD Board of Education constitutes the final policymaking authority for PRCSD for purposes of 42 U.S.C. §1983, and its actions in conducting official governmental proceedings in a dedicated religious facility and opening those proceedings with a Biblical reading constitute official policy.

137. The conduct described herein violated the Establishment Clause of the First Amendment, including: conducting official governmental employment proceedings in a dedicated religious facility, incorporating an extended Biblical reading into those official proceedings, and subjecting a private citizen seeking public employment to a compelled religious exercise from which she had no meaningful ability to withdraw without forfeiting her candidacy.

138. Plaintiff's participation in the religious exercise was effectively compelled, as she was a private citizen subject to an employment evaluation by the same governmental officials simultaneously conducting the religious exercise, with no meaningful opportunity to decline participation free from direct professional consequence.

139. As a direct and proximate result of PRCSD's violation of the Establishment Clause, Plaintiff suffered concrete and particularized injury, including compelled participation in a religious exercise, governmental coercion of her religious identity and autonomy, severe emotional distress, and physical health consequences, all as more fully set forth in the Statement of Facts above.

## COUNT II:  VIOLATION OF TITLE VII – RELIGIOUS DISCRIMINATION

140.    Plaintiff re-alleges and incorporates all averments set forth in paragraphs 1 through 139 above as if fully incorporated herein.

141.    Defendant has discriminated against Plaintiff because of her religion based on the facts identified above which constitutes a violation of Title VII of the Civil Rights Act of 1964.

142.    Plaintiff has suffered lost wages, benefits and other pecuniary losses as well as well as future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses.

143.    The unlawful actions of Defendant complained of above were intentional, malicious, and taken in reckless disregard of the statutory rights of Plaintiff.

## COUNT III:  VIOLATION OF TITLE VII – SEX DISCRIMINATION

144.    Plaintiff re-alleges and incorporates all averments set forth in paragraphs 1 through 143 above as if fully incorporated herein.

145.    Defendant has discriminated against Plaintiff because of her sex based on the facts identified above which constitutes a violation of Title VII of the Civil Rights Act of 1964.

146.    Plaintiff has suffered lost wages, benefits and other pecuniary losses as well as well as future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses.

147.    The unlawful actions of Defendant complained of above were intentional, malicious, and taken in reckless disregard of the statutory rights of Plaintiff.

## COUNT IV: VIOLATION OF THE 14TH AMENDMENT THROUGH
## 42 U.S.C. § 1983 – FOR SEXUAL DISCRIMINATION

148.    Plaintiff re-alleges and incorporates all averments set forth in paragraphs 1 through 147 above as if fully incorporated herein.

149.    The Defendants discriminated against Plaintiff because of her sex by subjecting her to sex discrimination as set forth in more detail above which constitutes a violation of the 14th Amendment through 42 U.S.C. §1983.

150.    Plaintiff has suffered lost wages, benefits and other pecuniary losses as well as deep humiliation, anxiety and emotional distress.

151.    The unlawful actions of the Defendant complained of above were intentional, malicious, and taken in reckless disregard of the statutory rights of Plaintiff.

## PRAYER FOR RELIEF

**WHEREFORE PREMISES CONSIDERED**, Plaintiff respectfully prays that upon hearing of this matter by a jury, the Plaintiff be granted the following relief in an amount to be determined by the jury:

1.    A declaratory judgment that PRCSD's conduct violated Plaintiff's rights under the Establishment Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and Title VII of the Civil Rights Act of 1964, as amended;

2.    A permanent injunction enjoining PRCSD and its Board members, officers, employees, agents, and successors from engaging in or permitting the unconstitutional and unlawful practices described herein, including conducting official governmental hiring proceedings in dedicated religious venues and incorporating religious exercises into official governmental employment proceedings;

3.    Back wages;

25

4.      Reinstatement or future wages in lieu of reinstatement, including compensation for the adverse impact of Defendant's conduct on Plaintiff's retirement pension under the Public Employees' Retirement System of Mississippi ("PERS");

5.      Compensatory damages;

6.      Attorney's fees pursuant to 42 U.S.C. § 2000e-5(k) and 42 U.S.C. § 1988;

7.      Lost benefits;

8.      Pre-judgment and post-judgment interest;

9.      Costs and expenses; and

10.     Such further relief as is deemed just and proper.

THIS, the 13th day of April 2026.

Respectfully submitted,

KELLEIGH BROUSSARD, PLAINTIFF

By: /s/Louis H. Watson, Jr.
Louis H. Watson, Jr.  (MB# 9053)
Jane A. Watson (MB# 106877)
Attorneys for Plaintiff

OF COUNSEL:

THE WATSON LAW FIRM, PLLC
1501 JACKSON AVE W STE 113 PMB 101
OXFORD, MS 38655-2566
Telephone: (601) 968-0000
Facsimile: (601) 968-0010
Email: louis@thewatsonlawfirm.com
jane@thewatsonlawfirm.com

26